# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 7, 2018       Decided March 1, 2019

No. 18-5179

NATIONAL PARKS CONSERVATION ASSOCIATION,
APPELLANT

v.

TODD T. SEMONITE, LIEUTENANT GENERAL, ET AL.,
APPELLEES

Consolidated with 18-5186

Appeals from the United States District Court
for the District of Columbia
(No. 1:17-cv-01361)
(No. 1:17-cv-01574)

*Matthew G. Adams* argued the cause and filed the briefs for appellants National Trust for Historic Preservation, et al.

*William S. Eubanks II* argued the cause for appellant National Parks Conservation Association. With him on the briefs was *Eric R. Glitzenstein*.

*J. Blanding Holman* was on the brief for *amici curiae* The Lawyer's Committee for Cultural Heritage Preservation, et al. in support of appellant.

*Tyler Joseph Sniff* was on the brief for *amici curiae* 18th Director of the National Park Service Jonathan B. Jarvis, et al. in support of appellant National Parks Conservation Association.

*Dustin J. Maghamfar*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, *Eric A. Grant*, Deputy Assistant Attorney General, and *Andrew C. Mergen*, *Mark R. Haag*, and *Heather E. Gange*, Attorneys.

*Elbert Lin* argued the cause for appellee Virginia Electric and Power Company. With him on the brief were *Eric J. Murdock*, *Harry M. Johnson, III*, and *Timothy L. McHugh*.

*Michael J. Thompson* and *Brett K. White* were on the brief for *amici curiae* PJM Interconnection, L.L.C. in support of appellees.

Before: GARLAND, *Chief Judge*, and TATEL and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In order to "create and maintain conditions under which man and nature can exist in productive harmony," the National Environmental Protection Act (NEPA), 42 U.S.C. § 4331(a), requires any federal agency issuing a construction permit, opening new lands to drilling, or undertaking any other "major" project to take a hard look at the project's environmental consequences, *id.* § 4332(2)(C), including the impacts it may have on "important historic . . . aspects of our national heritage," *id.* § 4331(b). To this end, the

agency must develop an environmental impact statement (EIS) that identifies and rigorously appraises the project's environmental effects, unless it finds that the project will have "no significant impact." 40 C.F.R. § 1508.9(a)(1). And that is what happened here. The U.S. Army Corps of Engineers ("Corps") granted a permit allowing a utility company to build a series of electrical transmission towers across the historic James River, from whose waters Captain John Smith explored the New World, and it did so without preparing an EIS because it found that the project would have "no significant impact" on the historic treasures along the river. As explained below, however, the Corps's "no significant impact" finding was arbitrary and capricious: important questions about both the Corps's chosen methodology and the scope of the project's impact remain unanswered, and federal and state agencies with relevant expertise harbor serious misgivings about locating a project of this magnitude in a region of such singular importance to the nation's history. Accordingly, we reverse the district court's decision to the contrary and remand with instructions to vacate the permit and direct the Corps to prepare an environmental impact statement.

## I.

Over 400 years ago, Captain John Smith arrived on the shores of what is now known as the Chesapeake Bay. Keen on learning more about the unfamiliar land, Captain Smith voyaged up the winding James River, passing through lush forests and under open skies. During his voyages, Smith produced "maps and writings [that] influenced exploration and settlement in the New World for over a century." 152 Cong. Rec. 22,282 (2006) (statement of Rep. Davis). These journeys came to symbolize our nation's founding and to serve as an equally important reminder of one of the darkest episodes in our history—the settlers' devastation of Native American

populations, including the "eventual collapse of the Powhatan polity." John S. Salmon, Project Historian, National Park Service, Captain John Smith Chesapeake National Historic Water Trail Statement of National Significance 2 (2006).

Long after Smith's voyages, the river "serv[ed] as a strategic transportation corridor that shaped the settlement and commerce of the region." H.R. Res. 16, 110th Cong. preamble (2007). Indeed, "the economic, political, religious, and social institutions that developed during the first [nine] decades" of the corridor's settlement "have profound effects on the United States" to this day. Jamestown 400th Commemoration Commission Act of 2000, Pub. L. No. 106-565, § 2(a)(3), 114 Stat. 2812, 2812. The same region commanded center stage through the nation's infancy, bearing witness to "the British surrender that marked the end of the American Revolution." Colonial National Historical Park Amendments, S. Rep. No. 104-30, at 2 (1995).

Honoring these ties to our nation's past, Congress and several federal agencies have established a series of "historic resources" in and around the Chesapeake Bay, including Jamestown, Carter's Grove National Historic Landmark, and the Captain John Smith National Historic Trail ("Historic Trail"), the nation's only congressionally-protected water trail. Due to the James River's "extraordinary historic, economic, recreational, and environmental importance," Congress recognizes it as "'America's Founding River.'" H.R. Res. 16 §§ 1, 2. According to one representative, Congress "[d]esignat[ed] this [H]istoric [T]rail . . . to spur efforts to protect and restore the region's historic and environmental assets." 152 Cong. Rec. 22,283 (2006) (statement of Rep. Castle). Other members of Congress observed that the region "represents a lasting tribute to the American spirit of discovery and exploration," *id.* at 22,282 (statement of Rep. Davis),

affording visitors "the opportunity to marvel at some of the same sites that Captain Smith and his crew beheld 400 years ago," *id.* at 22,283 (statement of Rep. Hoyer).

The National Park Service, an agency of the Department of the Interior, pursuant to its obligation "to conserve the scenery [and] natural and historic objects" of our national parks, 54 U.S.C. § 100101(a), acts as steward of these resources, striving to "offer[] visitors an opportunity to vicariously share the experience of Smith and his crew" through views "evocative of the seventeenth century," Park Service, A Conservation Strategy for the Captain John Smith Chesapeake National Historic Trail Introduction 3 (2013). To this end, and in accordance with its conservation "management plan" for the Historic Trail, the Service seeks to "[m]aximize the visual and historical integrity of the visitor experience" by, among other things, ensuring that all new utility lines are underground. Park Service, General Management Plan: Colonial National Historical Park 19, 34 (1993) ("Management Plan").

Enter the demands of modernity. Although the approximately fifty-mile leg of the James River involved in this case has retained its seventeenth-century charm, the rest of Virginia has kept apace with modern development, which means it depends on electricity. Following the 2012 issuance of an Environmental Protection Agency rule requiring power generation facilities to reduce certain air pollutant emissions, *see* 77 Fed. Reg. 9304 (Feb. 16, 2012), Virginia Electric and Power Company ("Dominion") determined that, in order to comply with the rule, it would have to retire two coal-fired power generators. To compensate for the resulting electricity shortfall, Dominion applied in 2013 to the Corps, which has jurisdiction over certain projects concerning "waters of the United States," *see* 33 C.F.R. § 328.1 (internal quotation marks

omitted), for a permit to construct a new electrical switching station and two transmission lines. Supported by seventeen 250-or-so-foot steel-lattice transmission towers, the line at issue here would stretch for eight miles, four of which would cross the James River and cut through the middle of the historic district encompassing Jamestown and other historic resources. *See* Figure 1.

*Figure 1: Overview Map of Project and Historic Properties (created by Industrial Economics, Inc.), Joint Appendix (J.A.) 495*



Before it could greenlight the undertaking, known as the Surry-Skiffes Creek-Whealton project ("Project"), the Corps had to satisfy several statutory obligations. First, as relevant here, NEPA required the Corps to consider alternatives to the Project and to prepare an "environmental impact statement" if the Project would "significantly affect[] the quality of the human environment," 42 U.S.C. § 4332(2)(C)—an analysis which must take into account effects on historic resources, 40 C.F.R. § 1508.8. But the Corps could bypass preparation of an

EIS if, based on a preliminary "environmental assessment," it determined that the Project would have "no significant impact" on the environment. 40 C.F.R. § 1508.9. Second, the Clean Water Act required the Corps to determine that no "practicable alternative" existed that "would have less adverse effect on the aquatic ecosystem." *Id.* § 230.12(a)(3)(i). Third, the National Historic Preservation Act ("Preservation Act") required the Corps to "take into account the effect of the undertaking on any historic property," 54 U.S.C. § 306108, and, if the project might "directly and adversely affect any National Historic Landmark," to take steps "to minimize harm to the landmark," *id.* § 306107.

Pursuant to these obligations, the Corps studied the Project's environmental impacts and considered nearly thirty alternatives. In doing so, the Corps relied on a Cultural Resources Effects Assessment prepared by Dominion and its consultants, which included a series of photo simulations that superimposed mockups of the proposed towers over the existing landscape. In its initial environmental assessment, the Corps determined that the Project would adversely but non-significantly affect historic resources, rendering an EIS unnecessary.

At various points throughout the process, the Corps, as required by Preservation Act regulations, reached out to "consulting parties," which include local governments and other "individuals and organizations with a demonstrated interest in the undertaking." 36 C.F.R. § 800.2(c). It also invited other federal agencies and the public to comment on its NEPA process. *See* 42 U.S.C. § 4332(2)(C) (requiring an agency to "consult with . . . any Federal agency which has jurisdiction by law or special expertise" and to provide any resulting statements "to the public").

And comment they did, to the tune of 50,000 submissions, many of which urged the Corps to prepare an EIS. Condensing the gist of thousands of comments into one simple but clear proposition, the Advisory Council on Historic Preservation ("Advisory Council")—the independent federal agency tasked with the "preservation of historic propert[ies]," 54 U.S.C. § 306101(a)(1)—warned that the Project "threaten[s] to irreparably alter a relatively unspoiled and evocative landscape that provides context and substance for the historic properties encompassed within." Letter from Advisory Council Chairman 1 (May 2, 2017), J.A. 414.

Quite a few commenters also pointed to perceived errors in the Corps's determination that the Project would not significantly impact, in the Advisory Council's words, "historic properties of transcendent national significance." Letter from Advisory Council Director 1 (May 2, 2017), J.A. 411. Writing to the Corps fully twenty times, the Park Service warned that the Project "would forever degrade, damage, and destroy the historic setting of these iconic resources." Letter from Park Service Director 1 (Dec. 11, 2015), J.A. 1829. The Virginia Department of Historic Resources feared "irreparabl[e] alter[ation] [of] the character of the area." Letter from Virginia Department of Historic Resources Director 2 (Nov. 13, 2015), J.A. 1855. Others, including then-Interior Secretary Sally Jewell, the Council on Environmental Quality, and many non-governmental organizations, sounded similar alarms.

Other commenters identified what they viewed as serious flaws in the Corps's methodologies. To give a flavor of these concerns, a specialist at the Department of Energy's Argonne National Laboratory ("Argonne") found the Corps's analyses "scientifically unsound" and "completely contrary to accepted professional practice." Response from Robert Sullivan ¶ 1

(Jan. 10, 2017), J.A. 534. The Park Service, the Advisory Council, and others critiqued the Corps's socioeconomic, visual, and cumulative effects analyses.

Still other commenters criticized the Corps's evaluation of alternatives. Summarizing several such concerns, the Advisory Council wrote that the "alternatives analysis was extremely problematic," that the National Parks Conservation Association ("Conservation Association") had funded a study "that challenged the accuracy of the data and assumptions used by Dominion," and that the engineering firm retained by the National Trust for Historic Preservation ("National Trust") had developed alternatives that "would cost less to construct, be built more quickly, and meet all relevant reliability standards." Letter from Advisory Council Chairman 3 (May 2, 2017), J.A. 416. According to one of the Corps's own specialists, Dominion could yet "take a harder look at the alternatives" and the company's cost estimates for the alternatives were "bloated and excessive." Sustainable Program Manager Review 3–4, J.A. 540–41.

While this deluge poured in, the Corps consulted with various agencies, conducted site visits, and twice directed Dominion to revise its photo simulations. Upon reviewing these amended analyses, the Corps and Dominion still believed that the Project, alone among all options, met the requisite reliability, cost, and timing parameters.

Commenters remained unsatisfied. Several agencies warned that the revised analyses, as the Park Service put it, still contained "fundamental flaws" that, though "repeatedly identified," nonetheless "remain[ed] unresolved." Letter from Park Service Acting Regional Director 1 (Jan. 12, 2017), J.A. 475. Indeed, the "majority of the consulting parties" found Dominion's amendments "superficial and inadequate." Letter

from Advisory Council Chairman 3 (May 2, 2017), J.A. 416. Underscoring that such concerns endured past the final round of revisions, the Park Service director during this process submitted an amicus brief in his now-private capacity, emphasizing that, since the Project will "forever . . . destroy the historic setting of these iconic resources," the Park Service, were it the agency with permitting authority, could not approve the Project "because its adverse impacts are so significant." 18th Director of the National Park Service Jonathan B. Jarvis Br. 7 (internal quotation marks omitted).

The process reached a temporary denouement in 2017. Following the change in administration, then-newly appointed (now-former) Interior Secretary Ryan Zinke met with the Corps, acknowledged its "thoughtful and thorough consideration of the issues," and announced that he "st[ood] ready to sign a final agreement as a concurring party." Letter from Ryan Zinke 1 (Mar. 30, 2017), J.A. 420. Shortly thereafter, the Corps issued a permit to Dominion. In the accompanying Memorandum for the Record ("Memo"), the Corps acknowledged that the Project would "intrude upon the viewsheds of historic properties and on a unique and highly scenic section of the James River." Memo § 10.3.8, J.A. 257. Nonetheless, the Corps concluded, the effects on these "national treasure[s]" were "moderate at most" and "inherently subjective." *Id.* §§ 10.3.8, 12.3, J.A. 257, 266 (internal quotation marks omitted). Where visible at all, it explained, the transmission towers would not "block[]" or "dominate" the view and would join existing "modern visual intrusions," such as the Busch Gardens amusement park and recreational boat traffic. *Id.* § 10.3.8, J.A. 257–58.

The Corps also executed a Memorandum of Agreement with Dominion, in which the company agreed to offset the harm to historic resources by, among other things, periodically

reviewing the continued need for the Project and investing in Virginia's historic preservation efforts. Although a few other participants, including Interior, signed this Memorandum, most declined to do so because they remained concerned "that the adverse effects resulting from this undertaking [could not] be mitigated." Letter from Advisory Council Chairman 2 (May 2, 2017), J.A. 415.

The National Trust, the Association for the Preservation of Virginia Antiquities, and the Conservation Association (collectively, the "Conservation Groups") sued in district court alleging that the Corps failed to satisfy its NEPA, Clean Water Act, and Preservation Act obligations. The district court found that the "Corps made a 'fully informed and well-considered' decision" and granted summary judgment to the agency. *National Parks Conservation Association v. Semonite*, 311 F. Supp. 3d 350, 361 (D.D.C. 2018) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resource Defense Council*, 435 U.S. 519, 558 (1978)).

On appeal, the Conservation Groups present three arguments: that due to the significance of the Project's impacts, the Corps was required to prepare an EIS; that the Corps's alternatives analyses fell short of the requirements imposed by both NEPA and the Clean Water Act; and that the Corps failed to fulfill its obligations under section 110(f) of the Preservation Act, 54 U.S.C. § 306107, which requires an agency to minimize harm to any National Historic Landmark "directly and adversely" affected by a project. "We review the district court's decision to grant summary judgment de novo." *Aera Energy LLC v. Salazar*, 642 F.3d 212, 218 (D.C. Cir. 2011).

**II.**

We begin with the Conservation Groups' argument that NEPA required the Corps to prepare an EIS because, as they see it, the Project will significantly impact historic resources. "Our role in reviewing [the Corps's] decision not to prepare an EIS is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored." *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (internal quotation marks omitted). Responsible for determining whether the Corps's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), we ask whether the Corps is "able to make a convincing case for its finding" of no significant impact. *Sierra Club v. U.S. Department of Transportation*, 753 F.2d 120, 127 (D.C. Cir. 1985).

"NEPA's primary function is 'information-forcing,' compelling federal agencies to take a hard and honest look at the environmental consequences of their decisions." *American Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018) (internal citations omitted). To satisfy this "hard look" requirement, the Corps must prepare an EIS for any project "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under NEPA's regulatory scheme, crafted by the Council on Environmental Quality, such effects can be, among others, historic, aesthetic, or cultural. 40 C.F.R. § 1508.8. Congress has declared that "preserv[ing] important historic, cultural, and natural aspects of our national heritage" constitutes an important goal of the statute. 42 U.S.C. § 4331(b)(4). And we in turn have recognized that protecting such resources is "an interest that NEPA's procedural mandate was intended to vindicate." *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission*, 896 F.3d 520, 529 (D.C. Cir. 2018).

As mentioned earlier, if the Corps believes that a project may not require an EIS, it may first prepare an environmental assessment to determine whether a "no significant impact" determination might find support in the record. 40 C.F.R. § 1508.9(a).

During the NEPA process, the Corps must consult agencies with "special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.6(a)(2) (requiring agencies to use the resulting analysis "to the maximum extent possible"). But, as the lead agency, the Corps, which "b[ears] the ultimate statutory responsibility" for the Project, "does not have to follow [other agencies'] comments slavishly—it just has to take them seriously." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991).

Whether a project has significant environmental impacts, thus triggering the need to produce an EIS, depends on its "context" (region, locality) and "intensity" ("severity of impact"). 40 C.F.R. § 1508.27. Here, because all parties agree that the historically-saturated "context"—i.e., this 50-mile stretch of the James River—qualifies as significant, our inquiry focuses on the "intensity" element, which enumerates ten factors that "should be considered." *Id.* § 1508.27(b). Implicating any one of the factors may be sufficient to require development of an EIS. *See Grand Canyon Trust v. FAA*, 290 F.3d 339, 347 (D.C. Cir. 2002), *as amended* (Aug. 27, 2002) (granting a petition for review after finding a project implicated one factor, without reaching additional factors). The district court found that "none of the significance factors weigh in favor of [the] contention that an EIS is required." *National Parks Conservation Association*, 311 F. Supp. 3d at 363. The Conservation Groups disagree, arguing that the Project implicates three such factors: "[t]he degree to which the effects

on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4); "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources," *id.* § 1508.27(b)(3); and the "degree to which the action may adversely affect districts [or] sites . . . listed in or eligible for listing in the National Register of Historic Places," *id.* § 1508.27(b)(8). We consider each in turn.

**A.**

The first factor considers "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). The word "controversial," we held in *Town of Cave Creek v. FAA*, refers to situations where "'substantial dispute exists as to the size, nature, or *effect* of the major federal action.'" 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *North American Wild Sheep v. U.S. Department of Agriculture*, 681 F.2d 1172, 1182 (9th Cir. 1982)) (emphasis in original). And as we explained in *Fund for Animals v. Frizzell*, "certainly *something more* is required" for a highly controversial finding "besides the fact that some people may be highly agitated and be willing to go to court over the matter." 530 F.2d 982, 988 n.15 (D.C. Cir. 1975) (per curiam) (emphasis added).

According to the Conservation Groups, "[w]here, as here, two federal agencies have argued for years over the 'size,' 'nature,' and 'effect' of the project on resources under [the Park Service's] jurisdiction (as have other agencies with 'special expertise' under NEPA), the Court's test for 'controversy' fits like a glove." Conservation Association Br. 22 (emphasis omitted). For its part, the Corps asserts that, under *Cave Creek* and *Frizzell*, it "reasonably concluded that comments demanding an EIS 'represent passion for the affected

resources' . . . rather than substantive dispute." Corps Br. 38 (quoting Memo § 12.3, J.A. 266). The Conservation Groups acknowledge that a highly controversial finding must rest on more than passionate opposition, but they insist that the criticism of the Corps's NEPA process rises to the requisite "something more."

The Conservation Groups first point out that much of the disagreement centers on perceived defects in the Corps's methodology and that, as the district court observed, "[m]any courts have found 'something more' to be scientific or other evidence that reveals flaws in the methods or data relied upon by the agency in reaching its conclusions." *National Parks Conservation Association*, 311 F. Supp. 3d at 363 (citing *National Parks & Conservation Association v. Babbitt*, 241 F.3d 722, 736–37 (9th Cir. 2001)) (internal quotation marks omitted); *accord Biodiversity Conservation Alliance v. U.S. Forest Service*, 765 F.3d 1264, 1275 (10th Cir. 2014) ("A substantial dispute can be found, for example, when other information in the record cast[s] substantial doubt on the adequacy of the agency's methodology and data." (internal quotation marks and citation omitted)); *see, e.g.*, *Cave Creek*, 325 F.3d at 332 (no controversy where the petitioners "pointed to nothing casting serious doubt on [the agency's] preferred model"). An expert at Argonne labeled the Corps's analyses "scientifically unsound, inappropriate, and completely contrary to accepted professional practice," accusing the agency of conflating a cultural resource analysis with the very different visual resource analysis. Response from Robert Sullivan ¶ 1 (Jan. 10, 2017), J.A. 534. The Advisory Council voiced serious concerns about the photo simulations: "[T]here are flaws in the visual effects assessment. . . . [C]onsulting parties have repeatedly suggested that the Corps should require photographs and simulations from an adequate range of viewpoints . . . to illustrate the extent and magnitude of the effects." Letter from

Advisory Council Assistant Director 2 (Mar. 2, 2016), J.A. 1483. And the Park Service believed that the visual analyses "d[id] not meet [its] standards," questioning whether the Corps and Dominion completed "an adequate visual analysis," "evaluat[ed] . . . socioeconomic impacts," and undertook a "sufficient cumulative effects analysis." Letter from Park Service Associate Regional Director 1 (Mar. 25, 2016), J.A. 1357; Letter from Park Service Acting Regional Director 2 (Jan. 12, 2017), J.A. 476. If such comments, representing just a small sample of the many criticisms in the record, do not "cast substantial doubt on the adequacy" of the Corps's methodologies, *Biodiversity Conservation Alliance*, 765 F.3d at 1275 (internal quotation marks omitted), then we are unsure what would.

According to the Conservation Groups, the controversy surrounding the Project is especially intense because many of those raising concerns—methodological and otherwise—are themselves government agencies with "special expertise" over historic resources. 40 C.F.R. § 1501.6(a)(2). And as they also point out, courts regularly find that such concerns demonstrate that a project qualifies as highly controversial. *See, e.g.*, *North American Wild Sheep*, 681 F.2d at 1182 (criticism from conservationists, biologists, two state agencies, and "other knowledgeable individuals" represented "precisely the type of 'controversial' action for which an EIS must be prepared"); *Friends of the Earth, Inc. v. U.S. Army Corps of Engineers*, 109 F. Supp. 2d 30, 43 (D.D.C. 2000) (project classified as "genuinely and extremely controversial" where three federal agencies, one state agency, and the public "all disputed the Corps evaluation").

Again, the Conservation Groups are correct. The Advisory Council questioned the Corps's "treatment of effects on historic properties of transcendent national significance."

Letter from Advisory Council Director 1 (May 2, 2017), J.A. 411. Interior Secretary Jewell warned that the Project would "introduce a major intrusion into a landscape" like "no other preserved locale in the Nation." Letter from Sally Jewell 1 (Jan. 17, 2016), J.A. 473. The Park Service worried that the Project "would forever degrade, damage, and destroy the historic setting of these iconic resources," admonishing that "[t]his is not acceptable for resources designated by Congress to ensure their permanent protection." Letter from Park Service Director 1 (Dec. 11, 2015), J.A. 1829. As the Service observed, "[s]ince the 1930s, the visitor experience and interpretation of Jamestown has been a collective effort . . . to shift [visitors'] sense of place back in time," and "[w]ithin the Historic District the James River is unblemished by any man-made physical crossing." Letter from Park Service Associate Regional Director 6 (July 5, 2016), J.A. 878; Letter from Park Service Associate Regional Director 3 (Jan. 29, 2016), J.A. 1494. The Service repeatedly communicated its concerns to the Corps, and its own management plan requires that the "visual and historical integrity of the visitor experience" be "maximize[d]" and that all new utility lines be installed underground. Management Plan at 19, 34.

And the list goes on. Industrial Economics, Inc., a consultant retained by the Park Service, feared that the Project could "have implications for successful future designation [of Jamestown] as a UNESCO World Heritage Site." Industrial Economics, Inc. Report 9 (Jan. 2017), J.A. 499. The Virginia Department of Historic Resources warned of "irreparabl[e] alter[ation] [of] the character of the area." Letter from Virginia Department of Historic Resources Director 2 (Nov. 13, 2015), J.A. 1855. Members of Congress, delegates to the Virginia Assembly, the Keeper of the National Historic Register, and the Council on Environmental Quality all voiced similar reservations. The non-profit Coalition to Protect America's

National Parks, comprising current and former Park Service employees, pleaded, as did a bevy of other organizations, that "[t]he Corps owes . . . to this and future generations of Americans to protect the place where 'America Began.'" Letter from Coalition to Protect America's National Parks 1 (Dec. 23, 2016), J.A. 464.

These are hardly the hyperbolic cries of "highly agitated," not-in-my-backyard neighbors "willing to go to court over the matter." *Frizzell*, 530 F.2d at 988 n.15. Instead, they represent the considered responses—many solicited by the Corps itself— of highly specialized governmental agencies and organizations. The Advisory Council, tasked as it is with preserving America's historic resources, merits special attention when it opines, as it did here, on "the treatment of effects on historic properties of transcendent national significance." Letter from Advisory Council Director 1 (May 2, 2017), J.A. 411; *see also Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 858 (9th Cir. 1982) ("[J]udgments of historical significance made by the Advisory Council . . . deserve great weight."). Of course, as lead agency the Corps owes no obligation to bend to the will of others. *See Citizens Against Burlington*, 938 F.2d at 201 (a lead agency must only "take [other agencies' comments] seriously"). But repeated criticism from many agencies who serve as stewards of the exact resources at issue, not to mention consultants and organizations with on-point expertise, surely rises to more than mere passion.

The Corps argues that because the Park Service is a component of the Interior Department, Secretary Zinke's letter approving the Project, in the district court's words, "effectively withdrew" the Service's "previous stance that an EIS was required." *National Parks Conservation Association*, 311 F. Supp. 3d at 366. We disagree. For one thing, even if the Zinke letter did withdraw the Service's opposition, numerous other

groups remained adamantly opposed. We are unsure, moreover, whether the Zinke letter actually responds to the Park Service's concerns. As the Conservation Association points out, the letter "never even reference[s] [the Park Service's] objections [or] longstanding methodological critiques." Conservation Association Reply Br. 10. And most important, the Zinke letter says little about the only question before us: whether the Corps acted arbitrarily and capriciously in declining to prepare an EIS. Regardless of Interior's stance, the Corps retained its NEPA obligation to "consider adequately" whether the Project is highly controversial. *Cave Creek*, 325 F.3d at 327. Because the facts underlying the Park Service's concerns changed not at all between the Jewell and Zinke letters, the Corps had to either confront those facts or explain why the Zinke letter rendered them irrelevant. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."). Indeed, in our view, that two Interior Secretaries had diametrically different views about the same project on the same facts simply reinforces its controversial nature.

The Corps next contends that it did acknowledge and try to address concerns raised during the NEPA process by, for example, instructing Dominion to revise its analyses to address the shortcomings identified by commenters. But that misses the point. The question is not whether the Corps attempted to resolve the controversy, but whether it succeeded. Given that many critical comments, including those from the Advisory Council and the Argonne specialist, post-dated Dominion's revisions, the Corps obviously failed.

In short, the Corps's assessment of the scope of the Project's effects has drawn consistent and strenuous

opposition, often in the form of concrete objections to the Corps's analytical process and findings, from agencies entrusted with preserving historic resources and organizations with subject-matter expertise. This demonstrates the "something more" needed to show that "the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4).

**B.**

The next intensity factor the Conservation Groups cite examines the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources." 40 C.F.R. § 1508.27(b)(3). According to the Conservation Association, "[t]he Corps-approved project entails putting giant modern transmission towers not only in close 'proximity to' numerous highly unique historic and cultural sites that are 'one-of-a-kind resources of national importance,' but putting them directly *in and across the nation's only Congressionally-designated historic water trail*." Conservation Association Br. 19 (emphasis in original) (citation omitted). The Corps responds that the Project "'is not a blockage to viewing the river or the surroundings' and 'will not dominate the view.'" Corps Br. 27 (quoting Memo § 10.3.8, J.A. 258). Again, the Corps misses the point.

Congress has consistently "recommit[ted] itself to protecting and restoring the James River for the enjoyment and prosperity of current and future generations." H.R. Res. 16 § 4. As one congressman put it, these efforts preserve "the opportunity [for visitors] to marvel at some of the same sites that Captain Smith and his crew beheld." 152 Cong. Rec. 22,283 (2006) (statement of Rep. Hoyer). Of course, when Captain Smith sailed up the James River in the seventeenth century, he beheld nothing either licensed by the U.S. Army

Corps of Engineers or built by Dominion Energy. In other words, even without blocking the view or dominating the landscape from all angles, the Project undercuts the very purpose for which Congress designated these resources: to preserve their "unspoiled and evocative landscape[s]." Letter from Advisory Council Chairman 1 (May 2, 2017), J.A. 414.

Insisting that the Project is nothing new, the Corps points to existing "modern visual intrusions" in the same region that represent a "successful mix of progress and history." Corps Br. 28 (quoting Memo § 10.3.8, J.A. 257). This mischaracterizes the record. Although there is some modern development, including an amusement park, boat traffic, and resorts, the Corps itself described these as largely "low density intrusions that become relatively lost within the overall landscape." National Register of Historic Places Eligibility 4 (May 7, 2015), J.A. 2205. As the Conservation Association observes, "the record does not support the assertion . . . that existing intrusions are remotely comparable in size, magnitude, or impact to this massive project that will be the *only* overhead crossing of the James River in a fifty-one-mile stretch." Conservation Association Br. 20 (emphasis in original).

The Corps maintains that the mitigation steps contained in its Memorandum of Agreement with Dominion "would reduce [the Project's] impacts to a minimum." Corps Br. 42. But the relevance of the Memorandum is dubious given that the Corps declined to rely on it when making its "no significance" findings. To the extent the Corps leans on it now, the document offers little support. Except for requiring Dominion to "examine" alternative "coating and finishing materials" for the transmission towers, the enumerated mitigation measures the Corps cites relate not to reducing the significance of the Project's visual impacts on the historic resources along the James River, but rather to periodic evaluation of the continued

need for the Project itself and to more general historic preservation efforts throughout the Commonwealth. Memorandum of Agreement § I.e.1, J.A. 293.

Finally, the Corps emphasizes that the Project's effects are visual and that the Seventh Circuit, citing our decision in *Maryland-National Capital Park and Planning Commission v. U.S. Postal Service*, 487 F.2d 1029, 1038–39 (D.C. Cir. 1973), stated that aesthetic "judgments are inherently subjective and normally can be made . . . reliably on the basis of an environmental assessment." *River Road Alliance, Inc. v. Corps of Engineers of U.S. Army*, 764 F.2d 445, 451 (7th Cir. 1985). But "normally" is not the same as "always." And in *Maryland-National Capital Park*, we distinguished aesthetic judgment calls that entail "defining what is beautiful" from situations like this one where Congress's purpose in designating the resources was to preserve "an unencumbered view of an attractive scenic expanse." 487 F.2d at 1038 & n.5.

## C.

The foregoing largely demonstrates why the Project implicates the final intensity factor invoked by the Conservation Groups: the "degree to which the action may adversely affect districts [or] sites . . . listed in or eligible for listing in the National Register of Historic Places." 40 C.F.R. § 1508.27(b)(8). Indeed, the Corps itself gets us much of the way there. It concedes that the Project's "close proximity" to Carter's Grove, an eighteenth-century Georgian-style plantation, "would detract from the resource's characteristics of setting and feeling which are integral to the resource's qualifications for listing on the [National Register of Historic Places]." Cultural Resources Effects Assessment § 3.9.4 (Sept. 15, 2015), J.A. 2024. And it is hardly just Carter's Grove. By the Corps's own count, the region boasts fifty-seven

sites on the National Register or eligible for inclusion on it—a concentration of historic resources found "[i]n no other place in [the] United States." Letter from Park Service Regional Director 1 (Oct. 22, 2015), J.A. 1911.

The Corps's findings, paired with the record's "robust, well-supported analyses, from agencies with Congressionally-delegated authority and recognized expertise," National Trust Br. 16, satisfy this intensity factor. The out-of-circuit cases cited by the Corps—concerning the construction of a golf clubhouse near another, historic one, *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1156 (9th Cir. 1998), and the refurbishment of an existing railroad to provide commuter service, *Advocates for Transportation Alternatives, Inc. v. U.S. Army Corps of Engineers*, 453 F. Supp. 2d 289, 294–95 (D. Mass. 2006)—are easily distinguishable, as they implicate neither comparably sized infrastructure nor equally august historic resources.

**D.**

The Corps has thus failed to make a "convincing case" that an EIS is unnecessary. *Myersville Citizens*, 783 F.3d at 1322. Three intensity factors demonstrate not only that the Project will significantly impact historic resources, but also that it would benefit from an EIS. Indeed, Congress created the EIS process to provide robust information in situations precisely like this one, where, following an environmental assessment, the scope of a project's impacts remains both uncertain and controversial. *See, e.g.*, *Grand Canyon Trust*, 290 F.3d at 345–47 (remanding for further proceedings when an agency, analyzing noise impacts on a national park "identified [by the Park Service] as among the nine national parks of 'highest priority,'" considered those impacts "in a vacuum" without sensitivity to the park's "natural quiet"); *American Rivers*, 895

F.3d at 50 (ordering an EIS based on concerns that the agency "just shrugged off" potentially significant impacts based on "estimates entirely unmoored from any empirical, scientific, or otherwise verifiable study or source").

**III.**

In preparing its EIS, the Corps will have to revisit its theories about alternatives under NEPA, which in turn will require it to reevaluate its Clean Water Act and Preservation Act analyses. Accordingly, we see no reason to address most of the remaining questions raised by the Conservation Groups. *See American Iron & Steel Institute v. EPA*, 115 F.3d 979, 1008 (D.C. Cir. 1997) ("see[ing] no profit" in addressing remaining argument where an agency was "already committed to agency revision"). Though taking no position on the adequacy of the Corps's alternatives analyses, we urge it to give careful consideration to its sister agencies' concerns that the prior iterations were "superficial," "inadequate," and "extremely problematic." Letter from Advisory Council Chairman 3 (May 2, 2017), J.A. 416.

There is, however, one issue whose resolution would facilitate further proceedings before the Corps. Specifically, the parties disagree about the meaning of section 110(f) of the Preservation Act, which provides that for any project "directly and adversely affect[ing] any National Historic Landmark," the agency must "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107. The debate centers on the word "directly" as it relates to Carter's Grove, the National Historic Landmark at issue. According to the Corps and the district court, because the Project does not "physically" intrude on the plantation's grounds—several towers are instead visible from them—section 110(f) does not apply. *See National Parks*

*Conservation Association*, 311 F. Supp. 3d at 379 ("The Court is persuaded that the meaning of 'directly' in Section 110(f) refers to physical impacts . . . ."). The National Trust disagrees, equating "directly" with having "no intervening cause." National Trust Br. 9 (internal quotation marks omitted).

Because we "owe no deference to [the Corps's] interpretation of a statute it does not administer," *Amax Land Co. v. Quarterman*, 181 F.3d 1356, 1368 (D.C. Cir. 1999), "[w]e begin our analysis with the language of the statute," *United States v. Wilson*, 290 F.3d 347, 352 (D.C. Cir. 2002). Although section 110(f) clearly encompasses physical effects, nothing in the statute's text so limits its reach. According to the dictionary, both now and at the time section 110(f) was passed, "direct" means "free from extraneous influence" or "immediate." Black's Law Dictionary (10th ed. 2014); *see also* Black's Law Dictionary (5th ed. 1979) ("direct" defined as "without any . . . intervening influence" or "[i]mmediate"). And had Congress wished to restrict section 110(f)'s reach to physical impacts, "it could have easily done so by using the word" physically. *Marx v. General Revenue Corp.*, 568 U.S. 371, 384 (2013). Finally, although no agency has provided binding guidance, the two actually responsible for administering this statute—the Park Service, 54 U.S.C. § 306101(b), and the Advisory Council, *id.* § 304108(a)—both understand "directly" to "refer[] to causation and not physicality." Letter from Advisory Council Assistant Director 4 (Mar. 2, 2016), J.A. 1485; *see also* Lawyers' Committee for Cultural Heritage Preservation Br. 19, Ex. A, Letter from Park Service Acting Associate Director 2 (Sept. 21, 2017) ("The [Park Service] does not agree with the Corps' position that Section 110(f) applies only when an undertaking may physically impact a National Historic Landmark."). On remand, therefore, the Corps must reconsider its Preservation Act analysis using this proper definition.

## IV.

For the foregoing reasons, we reverse and remand to the district court with instructions to vacate Dominion's permit and direct the Corps to prepare an environmental impact statement.

*So ordered.*